## FEE *v.* BROWN.

ERROR TO THE SUPREME COURT OF THE STATE OF COLORADO.

No. 165.  Submitted March 20, 1896. — Decided April 27, 1896.

The reservations granted by provision "First" in § 1 of the act of Decem-
ber 19, 1854, c. 7, 10 Stat. 598, "to provide for the extinguishment of
the title of the Chippewa Indians to the lands owned and claimed by
them," etc., are limited to the territory ceded by the Indians, both
as applied to Indians of pure blood, and to Indians of mixed blood.

The scrip certificates, under which the defendant in error claims, were
intended to be located only by half-breeds to whom they were issued,
and patents were to be issued only to the persons named in those certif-
icates; and, consequently, the right to alienate the lands was not given
until after the issue of the patents.

The act of June 8, 1872, c. 357, 17 Stat. 340, "to perfect certain land titles,"
etc., was intended to permit a purchaser of such scrip certificates, who
through them had acquired an invalid title to public land, to perfect
that title by compliance with the terms of that statute.

THIS was an action of ejectment, originally brought in the district court of Arapahoe county, Colorado, by Jane C. Brown, against the plaintiff in error, Fee, to recover a tract of land in Pueblo county, to which plaintiff claimed title under a patent issued December 1, 1876, to Henry C. Brown. This land had been located by authority of certain scrip, issued to the Chippewa Indians of Lake Superior, under a treaty made with them September 30, 1854, 10 Stat. 1109, by which the Chippewas ceded to the United States certain lands, theretofore owned by them, and in return the United States agreed to issue patents for eighty acres of land to each head of a family, or single person over 21 years of age, of mixed bloods. In executing this provision, the beneficiaries were identified by the issuance of certificates called " Chippewa half-breed scrip."

One Mary Dauphinais, having received a scrip certificate as a beneficiary under such treaty, Henry C. Brown, the patentee, from whom the plaintiff claimed title, in February, 1867, purchased the scrip so issued to Mary Dauphinais, from one Daniel Witter, who, acting as attorney in fact of Dauphinais, located the land in controversy. A patent was issued therefor in December, 1868, to Mary Dauphinais, the beneficiary. Under a second power of attorney Witter, as her attorney in fact, immediately conveyed the patent title to Brown, who subsequently conveyed to Jane C. Brown through one Frank Owers, an intermediary.

In view of certain abuses and frauds which appear to have sprung up in relation to the issue, sale and dealings in this scrip, as well as some conflicting rulings of the land department, as to whether such scrip could be used to locate lands outside of the treaty cession, Congress, on June 8, 1872, passed an act authorizing the Secretary of the Interior to permit the purchase of such lands as might have been located with claims arising under the Chippewa treaty in question, at a price not less than $1.25 per acre, and also permitting owners and holders of such claims in good faith to complete their entries, and to perfect their titles under such claims, provided the claims were held by innocent parties in good faith, etc.

In May, 1875, Brown having been informed by certain judicial rulings of the invalidity of his title, by reason of the scrip having been located outside of the ceded territory, made application for the issue of a new patent, under the provisions of the act of June 8, 1872; surrendered and relinquished to the United States all his rights under the Dauphinais patent, and, after a contest with one Smith, was adjudged by the Secretary of the Interior to be entitled to a new patent, which was accordingly issued to him December 1, 1876. This patent Fee attacked as void upon its face, and as having been issued without authority of law.

Defendant Fee settled upon the land in question on September 12, 1888, and upon the same date made application to the register of the land office at Pueblo, Colorado, to enter the land as a homestead, under the laws of the United States, and tendered to the receiver of the land office his legal fees and commissions due upon making such application. This application is now, and was at the time this action was commenced, undetermined by the officers of the United States having control of the sale and disposition of the public lands. Fee has resided on the land ever since his settlement there, September 12, 1888, and was residing thereon when issue was joined in this action.

An order having been entered changing the venue to the county of Pueblo, defendant answered denying the allegations of the complaint, alleging the invalidity of plaintiff's title, and setting up his own title under the homestead entry.

The court having sustained a demurrer to this answer, the parties entered into a stipulation, pursuant to which a judgment was entered in favor of the plaintiff for a recovery of the possession of the premises, and for a writ of possession. Defendant thereupon appealed the case to the Supreme Court of the State, which affirmed the judgment of the court below. 17 Colorado, 510. Whereupon defendant Fee sued out a writ of error from this court.

*Mr. J. M. Vale, Mr. C. C. Clements* and *Mr. F. Betts* for plaintiff in error.

The act of June 8, 1872, does not extend the operation of the treaty and the act of December 19, 1854, as to the location of land by Chippewas of mixed blood. It expressly limits the Secretary of the Interior to "permitting the purchase of such lands as may have been located with claims arising under the seventh clause of the second article of the treaty," and the history of the times shows that Congress then knew of many claims which had been located within the ceded territory, presumably in good faith. And as no claim could legally arise under this clause of the treaty which would warrant the location of land beyond the cession, clearly the Secretary of the Interior acquired no jurisdiction from the act of 1872 to sell and issue a patent for lands lying outside that territory.

It cannot be disputed that without the powers conferred upon the officers of the Land Department by the act of 1872 no jurisdiction existed to sell the land in controversy to Brown and issue a patent therefor; but the difficulty is only intensified by looking at the act of 1872 in connection with the patent. That act limits the jurisdiction of the Secretary, by its express terms, to the sale of land located with claims arising under the seventh clause of the second article of the treaty, which clearly could only arise within the ceded territory; the patent to Brown is for lands outside of the ceded territory, and no jurisdiction attached to the officers of the Land Department under the act of 1872 to issue it, and it is therefore void upon its face, because no provision has ever been made by law for the sale of the land in the manner it purports to have been sold to Brown. *Polk's Lessee* v. *Wendell,* 9 Cranch, 87; *St. Louis Smelting Co.* v. *Kemp,* 104 U. S. 636, 641; *Wright* v. *Roseberry,* 121 U. S. 485, 519; *Patterson* v. *Winn,* 11 Wheat. 380.

The act of 1872, so far as it relates to public lands, is *in pari materia* with the act of December 19, 1854, the treaty of 1854, in its seventh clause of the second article thereof, and the act of April 24, 1820. It does not repeal by its terms either of the prior acts, or modify the terms of the treaty. The cited acts and the clause of the treaty must be so con-

strued as to give force and effect to all and every part thereof. This cannot be done by extending the operations of the act of 1872, in its remedial effects, to lands lying beyond the ceded territory.

*Mr. James H. Brown* for defendant in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case turns upon the proper interpretation of the act of Congress of June 8, 1872, c. 357, 17 Stat. 340, subsequently incorporated into the Revised Statutes as section 2368, authorizing the Secretary of the Interior to permit the purchase of such lands as may have been located with Chippewa half-breed scrip, provided that such locations have been made in good faith, and by innocent holders of the same. Did this authorize the purchase of land which had been located outside of the territory ceded to the United States by the treaty of September 30, 1854, between the United States and the Chippewa Indians of Lake Superior and the Mississippi? 10 Stat. 1109.

To answer this question satisfactorily requires the consideration of the exact terms of the treaty and the proceedings thereunder. By the first article the Chippewas of Lake Superior ceded certain territory to the United States, theretofore owned by them in common with the Chippewas of the Mississippi, and the latter assented and agreed to such cession upon certain terms, unnecessary to be specified. By article 2, the United States agreed " to set apart and withhold from sale, for the use of the Chippewas of Lake Superior," certain tracts of land described in six paragraphs, all of which tracts lie in the neighborhood of Lake Superior and within the States of Michigan, Wisconsin and Minnesota. The seventh paragraph of article 2 provides that " each head of a family or single person over twenty-one years of age at the present time of the mixed bloods, belonging to the Chippewas of Lake Superior, shall be entitled to eighty acres of land, to be

selected by them under the direction of the President, and which shall be secured to them by patent in the usual form." Article 3 provides that the reserved tracts shall be surveyed; that the President shall make assignments to the parties entitled to the lands in severalty, and issue patents as fast as the occupants become capable of transacting their own affairs, with such restrictions upon the power of alienation as he may see fit to impose. The other articles of the treaty cut but a small figure in this case.

As a means of identifying the persons, who, under the seventh paragraph of the second article, were entitled to the lands, certificates were issued to such persons, which became known as Chippewa half-breed scrip. These certificates provided that any sale, transfer, mortgage, assignment or pledge thereof, or of any right accruing thereunder, would not be recognized as valid by the United States, and that patents for lands located by authority thereof should be issued directly to the person named in the certificate, and should in nowise enure to the benefit of any other person or persons whatsoever. This seems to be conceded in this case. Notwithstanding this provision, which was intended to secure to the holder of the certificates the land itself, they were made the subject of purchase and sale, through the device of powers of attorney signed by the person to whom the scrip was issued, authorizing some person, whose name was left blank, to locate the scrip upon lands to be selected by him, and to sell and convey the lands so selected. On the patent being issued to the person named in the certificate, the name of the attorney was filled in, and the deed executed by such person as the attorney-in-fact of the person named in the certificate, to the actual purchaser. Of course this scheme was in the nature of a fraud upon the act.

There was no legal restriction against the conveyance by the half-breed of the patent title when once acquired; and no provision upon the face of the scrip limiting its purchasing power to any particular portion of the unappropriated public lands of the government. In fact, it appears from the time it first began to be issued, that it was expressly recognized and

received by officers of the land office as subject to be located anywhere upon the public domain, both within and without the land ceded to the government by the treaty provisions.

The abuses connected with the transfer of this scrip in the manner above stated finally became so flagrant, that the attention of Congress was called to the subject, and on December 20, 1871, a resolution was adopted calling, among other things, for the following information:

"1. The number of pieces of scrip of 80 acres each, and the names of the parties to whom issued. . . .

"4. A copy of said scrip, the manner of locating the same, whether by the parties to whom it was issued, or by others; whether located upon *lands ceded by said tribe,* and all decisions of the Department of the Interior in relation to the issuance and location of said scrip."

There appears to have been a report made in pursuance of this resolution on March 12, 1872; and on June 8, 1872, an act was passed in the following terms:

"The Secretary of the Interior be, and he is hereby, authorized to permit the purchase, with cash or military bounty land warrants, of such lands as may have been located with claims arising under the seventh clause of the second article of the treaty of September thirtieth, eighteen hundred and fifty-four, at such price per acre as the Secretary of the Interior shall deem equitable and proper; but not at a less price than one dollar and twenty-five cents per acre; and that owners and holders of such claims in good faith be also permitted to complete their entries, and to perfect their titles under such claims upon compliance with the terms above mentioned: *Provided,* That it shall be shown to the satisfaction of the Secretary of the Interior that such claims are held by innocent parties in good faith, and that the locations made under such claims have been made in good faith, and by innocent holders of the same." Act of June 8, 1872, c. 357, 17 Stat. 340.

In pursuance of this act, Brown applied for and obtained, upon the payment of $2.50 per acre, a new patent for the lands which had been located by Witter in Colorado.

We think it was probably intended that the power to
locate this scrip should be confined to the territory ceded
to the United States by the first article, though perhaps not
to the tracts named in the first six paragraphs of the second
article of the treaty of September 30, 1854. By this second
article the United States agreed to set apart and withhold
from sale for the use of the Chippewas of Lake Superior
certain tracts of land, all of which were within the States
of Michigan, Wisconsin and Minnesota, and in the same ar-
ticle, paragraph 7, provided that each head of a family or
single person over 21 years of age, of mixed blood, should
be entitled to eighty acres of land, to be selected by them
under the direction of the President. By article 3 the
boundaries of the tracts were to be determined by actual
survey, and the President was authorized to assign to
each head of a family or single person over twenty-one
years of age, eighty acres of land for his or their separate
use, and as fast as the occupants became capable of trans-
acting their own affairs, to issue patents therefor to
such occupants, with such restrictions upon the power of
alienation as he might see fit to impose. There is some
reason for saying that this article was intended to apply to
Indians of pure, as distinguished from those of mixed blood.
By subsequent articles the United States agreed to pay for
the land ceded an annuity, and also a certain sum in agri-
cultural implements, household furniture and cooking utensils,
and also to furnish guns, rifles, beaver traps, ammunition and
ready made clothing, to be distributed among the young men
of the nation, as well as to furnish a blacksmith and assistant,
with the usual amount of stock, during the continuance of the
annuity payments. Article 7 provided against the manufact-
ure, sale or use of spirituous liquors on any of the lands there-
in set apart for the residence of the Indians, and the sale of
the same was prohibited in the territory thereby ceded until
otherwise ordered by the President.

The whole scope and purpose of this treaty was evidently
to induce the Chippewas to relinquish their claims to a large
amount of territory theretofore owned by them, and to re-

ceive in lieu thereof a certain annuity, and also six tracts of land within the States above named, which were to be allotted, at the discretion of the President, in severalty, and in parcels of eighty acres each to heads of families and single persons over 21 years of age. If there were any doubt upon the question, arising from article 2, the subsequent articles indicate very clearly that the reserved tracts were intended to be for the actual residence of the Indians and were to be within the States above named.

Beyond this, however, Congress, on December 19, 1854, passed an act, 10 Stat. 598, c. 7, which, though subsequent in date to the treaty, must, we think, be read in connection with it, and be held to operate as a ratification of it, by which the President was authorized to enter into negotiations with the Chippewa Indians for the extinguishment of their title to all the lands owned by them in Minnesota and Wisconsin, " which treaties shall contain the following provisions and such others as may be requisite and proper to carry the same into effect:"

" First. Granting to each head of a family, in fee simple, a reservation of eighty acres of land, *to be selected in the territory ceded,* so soon as surveys shall be completed, by those entitled, which said reservations shall be patented by the President of the United States, and the patent therefor shall expressly declare that the said lands shall not be alienated or leased by the reservees," etc.

If there were doubts latent in the language of the treaty itself, it is clear from this act that it was the intention of Congress to limit the reservations to the territory ceded, both as applied to Indians of pure and mixed blood.

This was the distinct ruling of the Supreme Court of California in *Parker* v. *Duff,* 47 California, 554, 566, in which an attempt had been made to locate certain of this scrip in California, and we see no escape from that conclusion. It is also entirely clear that this scrip was intended to be located by the half-breeds themselves; that the patents were to be issued to the persons named therein, and that the right to alienate the lands was never intended to be given until the patents had been issued. It follows from this that the loca-

tion of these lands in the State of Colorado gave no title to Brown, and that the patent issued thereon was void and of no effect.

The validity of Brown's title must turn, then, upon the patent issued to him on June 8, 1872. The argument of the plaintiff in error in this connection is that, under the terms of this act, the Secretary of the Interior could only permit the purchase of such lands as may have been located "with claims arising under the seventh clause of the second article of the treaty;" that the facts show that Congress then knew of the existence of more than 450 claims arising under this clause of the treaty, which had been located within the ceded territory, presumably in good faith, by innocent holders thereof; that, as no claim could legally arise under this clause which would warrant the location of lands beyond the cession, the Secretary of the Interior acquired no jurisdiction from the act of 1872 to sell or issue a patent for lands lying outside that territory.

We are not, however, disposed to put so narrow an interpretation upon this act. While it is true that Congress may have been apprised of the fact that a large number of claims had been located within the ceded territory, it is also apparent from the resolution of December 20, 1871, that it had also been informed of the location of half-breed scrip upon lands which had not been ceded by the Chippewas, and that there had been certain decisions of the land department to the effect that this might lawfully be done. The evil to be remedied was the one relating to these illegal locations, and, if consistent with its language, the act ought to receive a construction broad enough to effectuate this remedy. While Congress was not disposed to validate these locations as if they had been lawfully made, it did recognize them as giving to the locator a primary right of purchase, at a price not less than the minimum price of public lands, namely, $1.25 per acre.

Upon the theory of the plaintiff in error, that the act applied only to such locations as had been made in pursuance of the treaty within the lands ceded, it is difficult to see any substantial reason for this legislation, since, if the lands had been

already properly located, why compel the settlers to pay for them again, or why speak of them as holders of such claims in good faith, who should be permitted to complete their entries and perfect their titles? Or why provide that it should be shown that such claims were held by innocent parties in good faith, and that the locations made under such claims had been made in good. faith by innocent holders? Strictly speaking, no person who had. located this scrip, except the half-breeds themselves, could be said to be purchasers in good faith, since they were apprised by the treaty and the act of December 19, 1854, that the scrip could only be located within the ceded territory by the beneficiaries therein named, and that such scrip was incapable of alienation.

Congress, however, was evidently moved to use these words by the fact that this scrip had been misused by designing parties; had become an ordinary subject of barter and sale; had been located with the assent of the land department upon lands in other States, by unlearned men, who had acted themselves in perfect good faith, supposing that they had a legal right to do as they had done, and that to compel them to relinquish their holdings would be a great hardship to them and no advantage to the government, provided they were required to reimburse the government by paying for such holdings at the ordinary price at which public lands were sold. The words "located with claims arising under the seventh clause, of the second article of the treaty," may doubtless be interpreted as referring to claims which could only arise within the ceded territory. But we are satisfied that it was not the intention of Congress to give it that narrow construction, and that it adopted a course which, partially at least, protected the holder of the land and at the same time insured to the government. a proper compensation for them. It was doubtless contemplated that these lands might in the meantime have largely risen in value, or that persons obtaining knowledge of the invalidity of the original location may have proceeded to preëmpt them, to locate them under the homestead laws, or otherwise with a design of obtaining for a nominal consideration the benefit of their rise in value.

We are, therefore, of opinion that Brown obtained a good title to the land in question by the patent of December 1, 1876, and the judgment of the Supreme Court of Colorado is accordingly

*Affirmed.*